IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| ALBERTO GUILLEN, | Case No. CV 22-019-GF-BMM-JTJ |
| Plaintiff, | |
| v. | **ORDER** |
| MR. JOHNSON and MR. CANNON, | |
| Defendants. | |

Pending before the Court are Defendants Johnson's and Cannon's Motion for Summary Judgment, and Plaintiff Alberto Guillen's Motion for Judgment on the Pleadings. (Doc. 25); (Doc. 32.) The Court will grant Defendants' motion, finding that Guillen failed to exhaust his administrative remedies.

**I.     Background**

Guillen is incarcerated at Crossroads Correctional Center ("CCC") in Shelby, Montana. He is proceeding in forma pauperis and without counsel. Guillen asserts claims of violations of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) and the First Amendment's Free Exercise Clause. (Doc. 7 at 3.) The Court previously denied other claims and defendants at the screening stage.

Plaintiff is a Buddhist and has taken a vow of silence. He requested a religious accommodation that would allow him to meditate alone in his cell for "weeks, months, years," only leaving the cell for one hour in the morning. Defendant Johnson responded that the prison was not able to give Guillen a single cell. (Doc. 7-1 at 7.)

In support of his request, Guillen submitted an Informal Resolution Form that explained that his cellmate was noisy, talked a lot, and yelled at the guards, which interfered with Guillen's religious principles. Guillen also claimed to be unable to meditate with so much noise. He further alleges that the guards and other incarcerated people ask him questions, threatening his vow of silence. (Doc. 7-1 at 2.)

Defendant Cannon responded to this request with the statement that the only way for Guillen to get a single cell was to be put into the restricted housing unit, also known as the Hole. (Doc. 7-1 at 5.) Defendant Cannon provided Guillen with his requested Religious Practice Authorization Form, but Defendant Cannon did not give Guillen guidance on how to proceed with it. (Doc. 7 at 7.) Guillen asserts that after receiving a response to his Religious Practice Authorization Request, he did not know if the "grievance process was going forward or backward," which appears to be an allegation that the grievance procedure is flawed. (Doc. 7 at 8.)

**II.    Analysis**

2

Defendants move for summary judgment on three grounds: Guillen failed to exhaust his administrative remedies, Defendants did not violate RLUIPA, and Defendants have not violated Guillen's First Amendment Rights. (Doc. 25.) Guillen responds that he exhausted his remedies as far as they were "available", (Doc. 35 at 1-2)[1], and the Defendants are violating RLUIPA and the First Amendment. (Doc. 35 at 3-7).

Guillen has moved for what he has captioned as judgment on the pleadings, which in some sense is trumped by a motion for summary judgment. (Doc. 33.) That is, a motion on the pleadings asks the Court to look only at the pleadings without considering matters outside their scope. Fed. R. Civ. P. 12(c). A properly filed motion for summary judgment, however, such as Defendants' here, requires consideration of other matters. It would be illogical to consider Guillen's motion out of context. To the extent it raises arguments that could prevail in light of the other facts submitted to the record, the Court will consider Guillen's filing a motion for summary judgment.

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment

---

[1] Docs. 35 and 41 are almost identical, though they are captioned differently, and their conclusions differ. Citations regarding the content of specific pages in one are the same for the other.

"if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Id*. The Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in the non-moving party's favor when deciding a motion for summary judgment. *Id*. at 255 (1986); *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

**B.     Failure to Exhaust**

Defendants contend that Guillen's failure to exhaust his administrative remedies bars him from pursuing this suit. (Doc. 26 at 10-15.) Guillen responds that his failure to exhaust is excused. (Doc. 35 at 1-3.)

1. **Applicable Law**

The Prison Litigation Reform Act ("PLRA")'s exhaustion requirement states as follows:

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524-25 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must "complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 93 - 97 (2006). Exhaustion is mandatory. *Booth*, 532 U.S. at 741; *Jones v. Bock*, 549 U.S. 199, 211 (2007). "Exhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim." *Albino v. Baca*, 747 F.3d 1162, 1170 (9th Cir. 2014). The Court will analyze the failure to exhaust defense first.

The defendant bears the burden of showing that an administrative process was available to the incarcerated person and that the incarcerated person failed to exhaust it. *Fordley v. Lizarraga*, 18 F.4th 344, 350–51 (9th Cir. 2021); *Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005). If the defendant initially shows that (1) an available administrative remedy existed and (2) the prisoner failed to exhaust that remedy, then the burden of production shifts to the plaintiff to bring forth

5

evidence "showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014). The prisoner must produce evidence demonstrating that "the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (internal citations and quotation marks omitted).

"The ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Ross v. Blake*, 578 U.S. 632, 642 (2016) (citing *Booth*, 532 U.S., at 737-738.) Incarcerated people must exhaust those "grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 642 (quoting *Booth*, 532 U.S., at 738.)

Three general situations can render a prison or jail grievance process unavailable to an incarcerated person. First, an administrative procedure is not available, and therefore need not be exhausted, "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 578 U.S., at 643. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism

exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.,* at 643-44. "When rules are so confusing that no reasonable prisoner can use them, then they're no longer available." *Id.,* at 644 (internal quotation marks and alteration omitted). The procedures need not be sufficiently "plain," however, as to preclude any reasonable mistake or debate with respect to their meaning. *Id.* Congress has determined that the incarcerated person should err on the side of exhaustion when an administrative process is susceptible of multiple reasonable interpretations. *Id.*

Finally, administrative remedies will be deemed unavailable if "prison administrators thwart incarcerated people from taking advantage of a grievance process through machination, misrepresentation, or intimidation" or if administrators otherwise interfere with an incarcerated person's pursuit of relief. *Id.* at 1860. For example, the remedies will be considered unavailable under the following circumstances: if the prison improperly processed an incarcerated person's grievance, if prison officials misinformed an incarcerated person regarding grievance procedures, or if the incarcerated person "did not have access to the necessary grievance forms within the prison's time limits for filing the grievance." *Albino*, 747 F.3d at 1172-73. The Ninth Circuit has explained that an incarcerated person's fear of retaliation may suffice to render the grievance process unavailable, if the prisoner (1) "provide[s] a basis for the court to find that he

7

actually believed prison officials would retaliate against him if he filed a grievance," and (2) "demonstrate[s] that his belief was objectively reasonable." *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015).

Prison regulations define the exhaustion requirements under the PLRA. *Jones*, 549 U.S. at 218. As part of its contract with the Montana Department of Corrections ("DOC"), CoreCivic must adopt and adhere to certain DOC policies and procedures, including DOC's grievance policy and MSP's grievance procedure. MSP OP 3.3.3(III) governs the grievance process and states that grievable issues include "religious issues," among other things. MSP OP 3.3.3(III)(B)(1). With the exception of emergency grievances, the Inmate Grievance Program involves four steps: (1) informal resolution, (2) formal grievance, (3) appeal to the Warden, and (4) appeal to the Director of the DOC. MSP OP 3.3.3(III)(E), (III)(F), (III)(I), (III)(K); (Doc. 40-1.) Timelines exist for properly submitting grievances. MSP OP 3.3.3(III)(D). "If an inmate fails to advance to the next level of the grievance program within the stated time limit, he will be considered to have forfeited the opportunity to exhaust his administrative remedies under the inmate grievance program." MSP OP 3.3.3(III)(D)(5).

The Affidavit of Assistant Warden Crenshaw, which supports Defendants' SUF, details Guillen's use of the grievance procedure. (Doc. 29.) The Affidavit discusses two exhibits, the MSP grievance policy and Guillen's grievance file.

(Doc. 40-1); (Doc. 40-2.) The affidavits refer heavily to Guillen's grievance history. The grievances at issue are appended to Guillen's Amended Complaint. (Doc. 7.) Crenshaw's Affidavit states that all of Guillen's grievances are attached in Exhibit B, but that is inaccurate. Guillen also attached some of his grievances and requests to his original and Amended Complaints.

The following facts about Guillen's use of the grievance problem are generally taken from Defendants' SUF and the copies of Guillen's documents. Guillen's Statement of Disputed Facts does not serially rebut Defendants' SUF, as required by D. Mont. L. R. 56.1(b). (Doc. 41-2.) Guillen does not contest any of the facts regarding the grievance policy or his own grievance history.

Guillen sent an inmate letter to a case manager on June 24, 2021, stating that he had taken a vow of silence and that he needed to be in a cell alone to pursue a "meditation retreat" with "minimal disterbances (sic)." Aff. Crenshaw ¶ 12; (Doc. 7-1 at 3.) Guillen then sent a kite to the chaplain on July 4, 2021, requesting a religious accommodation form. (Doc. 7-1 at 2.) The chaplain responded on July 14, 2021, thanking Guillen for his conversation earlier that day. Aff. Crenshaw ¶ 13. The chaplain said that he would speak with CoreCivic staff about Guillen's vow of silence, but that his request for an individual cell could not be granted. *Id.*

Guillen completed the first step of the grievance process when he filed an informal resolution form on July 15, 2021, reiterating that he had taken a vow of silence, and that he needed an individual cell in order to meditate for years or months at a time undisturbed. Aff. Crenshaw ¶ 14; (Doc. 2-1 at 6.) The informal grievance was denied by CoreCivic staff on July 27, 2021. The response included a religious practice authorization form for Guillen to complete. *Id.*

Guillen then took the second step and filed a formal grievance on July 27, 2021, including the same information as the informal, but also claiming that the previous informal response was essentially a threat to be placed in the RHU as discrimination against his skin color and Buddhist religion. Aff. Crenshaw ¶ 16; (Doc. 7-1 at 8.) Staff did not respond to this grievance. Aff. Crenshaw ¶ 17. Under MSP Procedure 3.3.3, if staff does not respond to a formal grievance within 25 working days, the incarcerated person is required to appeal to the Warden within 5 working days in order to exhaust administrative remedies. Aff. Crenshaw ¶ 18. Guillen never filed any appeal to the warden or to the Director of DOC. Aff. Crenshaw ¶¶ 19-20. On the same day Guillen filed his formal grievance, he filed his Religious Practice Authorization Request. (Doc. 7-1 at 7.) His request was denied on August 2, 2021, with the refusal stating, "We do not provide single person housing cells." (*Id.*)

In response to Defendants' motion, Guillen does not dispute the recitation of what he did or did not do, but rather, asserts that the grievance process was "unavailable" to him. (Doc. 41 at 1-3.) Guillen focuses on two aspects of his journey: staff failed to provide him the Religious Practice Authorization Request Form on time, and Defendants did not provide guidance about the grievance process. (*Id*. at 1-2.) Guillen relies on *Ross v. Blake*, discussed above, to contend that the administrative process was unavailable to him in all three ways. The administrative remedy was a dead end because officers were unable or unwilling to provide relief, the administrative scheme was opaque and confusing, and prison administrators thwarted Guillen through machination, misrepresentation, and intimidation. (Doc. 41 at 2: "…[P]rison has refused to provide plaintiff with information about the grievance process, provided no guidance in its rejection and mislead [sic] the plaintiff".)

The "dead end" of an administrative process cannot simply be that the plaintiff did not immediately get the relief he sought. Otherwise, any denial of an informal request would justify going straight to litigation. Some requests are clearly beyond the capacity or authority of lower individuals on the prison hierarchy to grant. Guillen asked the chaplain for a single cell, which is not likely to be granted. Guillen contends that staff's inability to provide him the relief he sought meant the procedure was a dead end. The Court disagrees.

Second, Guillen alleges that the prison refused to provide him information about the grievance process. Defendants assert that the grievance procedure is available to inmates. (Doc. 26 at 13-14.) No evidence in the record exists regarding whether Guillen himself received a hard copy of the policy, but Guillen did not dispute the policy's availability. Guillen has certainly used the grievance procedure, as evidenced by his grievance file. Each grievance form includes the information about the right to appeal the response and the need to do so within five days. (*See, e.g.*, Doc. 2-1.) The Court concludes that Guillen was sufficiently apprised of the procedure to know he had to follow its steps.

Guillen appears to argue that he was confused by the interplay between the Religious Practice Authorization Request form and the grievance procedure. His formal grievance requested approval of the religious request, as well as specifically to have a single cell and to be left to meditate. He filed his Religious Request on the same day, though he received a response to his Religious Request and not to his grievance. Guillen apparently asked Defendants "What stage of the grievance process am I in?" and the response he got was "I don't know." (Doc. 41-1.)

This exchange reveals both Guillen's understanding that he needed to exhaust the administrative process, and that he had the option to pursue an answer other than "I don't know." Guillen's confusion over the interplay between the religious request form and the grievance procedure presents a non-issue. If Guillen

12

thought the religious form could be appealed by grievance, he could have filed a new informal after he learned of its denial. If he did not think it was part of the procedure, he could have followed his informal with a warden appeal, as the policy requires. Either way, Guillen failed to do anything after his religious request was denied. As the *Ross* court explained, the procedures need not be sufficiently "plain" as to preclude any reasonable mistake or debate with respect to their meaning, and an incarcerated person should err on the side of exhaustion. *Ross v. Blake*, 578 U.S. 632, 643 (2016). Guillen has failed to establish that the procedure was unavailable through opacity.

Guillen provides no information that would suggest anyone misled him. He apparently received an answer that the chaplain did not know about the grievance process, but that is not misleading. Guillen simply did not follow through on determining what was next. Defendants have established that there was an available administrative procedure. Guillen did not exhaust.

### III.   Conclusion

Guillen failed to exhaust his administrative procedure before filing his lawsuit. Pursuant to 42 U.S.C. § 1997e(a), Defendants are entitled to summary judgment.

### ORDER

Accordingly, it is **HEREBY ORDERED** that

1.   Defendants' Motion for Summary Judgment is **GRANTED**. (Doc. 25.)

2.   Plaintiff's Motion for Judgment on the Pleadings is **DISMISSED**. (Doc. 32.)

3.   The Clerk of Court is directed to enter judgment pursuant to Fed. R. Civ. P. 58.

DATED this 15th day of March, 2023.

_____
Brian Morris, Chief District Judge
United States District Court